Fletcher A. Robbe, Esq. SBN: 67295
Fletcher Robbe International Attorneys at Law
600 La Terraza Blvd.
Escondido, CA 92025
Tel: (858)500-0710
Email: frobbe@frobbeintl.com

Attorney for Plaintiff,
DALRADA FINANCIAL CORP.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DALRADA FINANCIAL CORPORATION, a Wyoming corporation; DEPOSITION TECHNOLOGY LTD., a United Kingdom company and wholly owned subsidiary of Dalrada Financial Corp.;

Plaintiffs,

v.

WILLIAM IAN MARTIN BONAR, as an individual and in his official capacity; MARION BONAR, as an individual and in her official capacity; IAN ROBERT MACKENZIE, as an individual and in his official capacity; SAMANTHA MACKENZIE, as an individual and in her official capacity; JILLIAN HUGHES, as an individual and in her official capacity; DOES 1 through 50, inclusive,

Defendants.

Case No.: '24CV2166 WQHBLM

**COMPLAINT FOR DAMAGES**

1. **Breach of Fiduciary Duty**
2. **Business Disparagement**
3. **Defamation**
4. **Tortious Interference with Contractual Relations**
5. **Fraud-Intentional Misrepresentation**
6. **Breach of Duty of Care**
7. **Tortious Interference with Business Relations-Harassment**
8. **Misappropriation of Trade Secrets [18 U.S.C. Sect. 1836; Cal. Civ. Code Sect. 3426]**
9. **Conspiracy to Misappropriate Trade Secrets [18 U.S.C. Sect. 1832(a)(5)]**

**DEMAND FOR JURY TRIAL**

## COMPLAINT

For its Complaint, Plaintiff Dalrada Financial Corporation alleges as follows:

## NATURE OF THE CASE

This action arises from Defendants' intentional conduct to interfere with Plaintiffs' business relations. Defendants' actions, detailed herein, including but not limited business disparagement and

defamation, resulted in tortious interference with Plaintiffs business relations, interference with Plaintiffs prospective advantage and damage to Plaintiffs' business and professional reputation.

## JURISDICTION AND VENUE

1. There are two sources of subject matter jurisdiction in this Court:

a. The parties' citizenship is completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. (28 U.S.C. §1332.)

b. A substantial part of this action arises under the laws of the United States. 28 U.S.C. §§ 1331 and 1337.

2. There are two sources of venue in this Court:

a. A substantial part of the events or omissions giving rise to the action occurred in this district. (28 U.S.C. §§ 1391 (a)(2).

b. Plaintiff, Dalrada Financial Corporation has a principal place of business in California at 600 La Terraza Blvd., Escondido, CA 92025, USA.

c. Defendant William Ian Martin Bonar is a resident of Bathgate, Scotland.

d. Defendant Marion Bonar is a resident of Bathgate, Scotland.

e. Defendant Ian Robert Mackenzie is a resident of Kingsbridge, Devon, England.

f. Defendant Samantha Mackenzie is a resident of Kingsbridge, Devon, England.

g. Defendant Jillian Hughes is a resident of Glasgow, Scotland.

h. All transactions subject to this Complaint have taken place in the United States, and pursuant to the subject contracts are under the jurisdiction of the State of California.

## THE PARTIES

**A. Plaintiffs:**

3. Plaintiff Dalrada Financial Corporation (hereinafter "DFCO") is a corporation duly registered in the state of Wyoming and the parent company of any and all subsidiaries relevant to this lawsuit.

**B. Defendants:**

4.      Defendant William Ian Martin Bonar (hereinafter "William") was, at all times relevant hereto, a citizen of the United Kingdom and an employee of DFCO as its Vice President of Worldwide Manufacturing, Research and Development.  William also acted as a Director on the Board of Plaintiff Likido Ltd., Deposition Technology, Ltd., Silicon Services Consortium, and Dalrada Technology, Ltd. all wholly owned subsidiaries of Plaintiff, until his resignation on September 30, 2024.

5.      Defendant Marion Bonar (hereinafter "Marion") was, at all times relevant hereto, a citizen of the United Kingdon and an employee of DFCO as its Human Resources Manager for Likido Green Energy, a United Kingdom company and wholly owned subsidiary of DFCO.

6.      Defendant Ian Robert Mackenzie (hereinafter "Ian") was, at all times relevant hereto, a citizen of the United Kingdom and a director for Deposition Technology Ltd., and Dalrada Technology Ltd., United Kingdom companies and  both of which are wholly owned subsidiary of Plaintiff, DFCO until his resignation on October 8, 2024.

7.      Defendant Samantha Mackenzie (hereinafter "Samantha") was, at all times relevant hereto, a citizen of the United Kingdom and an employee of DFCO as the Finance and Office Administrator of Deposition Technology, Ltd. and the Secretary of Deposition Technology, Ltd., a United Kingdom company and wholly owned subsidiary of DFCO from September 9, 2005 until the present.

8.      Defendant Jillian Hughes (hereinafter "Jillian") was, at all times relevant hereto, a citizen of the United Kingdom and an employee of DFCO as its Chief Operating Officer for Dalrada Technology, Ltd.

9.      The true names of Defendants Does 1 through 50, inclusive are persons and/or entities whose names are not yet known to Plaintiff and are sued herein under fictitious names pursuant to Code of Civil Procedure section 474.  Plaintiff is informed and believes, and based thereon alleges, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of the co-defendants, and

in taking the actions mentioned herein was acting within the course and scope of his or her authority as such agent, servant, partner, and employee, with the permissions and consent of the co-defendants. The named defendants and DOE defendants are sometimes hereafter referred to, collectively and/or individually, as "defendants".

10. Relationship of defendants: All defendants were responsible for the events and damages alleged herein, including on the following bases: (a) defendants committed the acts alleged; (b) at all relevant times, one or more of the defendants was the agent or employee, and/or acted under the control or supervision, of one or more of the remaining defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment and/or is or are otherwise liable for plaintiff's damages; (c) at all relevant times, there existed a unity of ownership and interest between or among two or more of the defendants such that any individuality and separateness between or among those defendants has ceased, and defendants are the alter egos of one another. Defendants exercised domination and control over one another to such an extent that any individuality or separateness of defendants does not, and at all times herein mentioned did not, exist. All actions of all defendants were taken by employees, supervisors, executives, officers, and directors during employment with all defendants, were taken on behalf of all defendants, and were engaged in, authorized, ratified, and approved of by all other defendants. Plaintiffs will inform the Court by way of Amendment to the Complaint once the true names of any Doe defendants have been ascertained.

**FACTUAL ALLEGATIONS**

11. On or about April 4, 2022, Plaintiff purchased Deposition Technology LTD., a United Kingdom company from Defendant, William Bonar.

12. On or about April 4, 2022, Plaintiff, by and through its wholly owned subsidiary, Dalrada Precision Corp., purchased Silicon Services Consortium from William Bonar, Marion Bonar, Ian Robert Mackenzie

and Samantha Mackenzie (husband and wife). (A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit "A").**

13. On or about March 1, 2023, Plaintiff, by and through its wholly owned subsidiary Dalrada Precision Manufacturing, Inc., purchased Dalrada Technology Ltd. from William Bonar and Pauline Gourdie. (A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit "B").**

14. Defendant William served as a director of Dalrada Technology, Ltd., Deposition Technology, Ltd., Silicon Services Consortium and Likido, Ltd. until his resignation on September 30, 2024.

15. Defendant Ian served as a director of Silicon Services Consortium and Likido Ltd. until his resignation on October 8, 2024.

16. On or about July 1, 2023, William was hired as an employee of DFCO as the Vice President of Worldwide Manufacturing, Research and Development at the Scotland facility. (A true and correct copy of the Employment Agreement is attached hereto as **Exhibit "C"**).

17. On or about January 2, 2023, Defendant Jillian was hired by Dalrada Technology Ltd as its Chief Operating Officer and Interim Chief Financial Officer until her resignation on August 29, 2024 (A true and correct copy of the Employment Agreement is attached hereto as **Exhibit "D").**

18. Defendant Samantha was hired by Deposition Technology, Ltd. as its Finance and Office Administrator. Samantha transitioned with Deposition Technology, Ltd. when purchased by Plaintiff. (A true and correct copy of the Job Description is attached hereto as **Exhibit "E").** Defendant Samantha's employment was terminated as a result of the conduct complained of herein on November 8, 2024.

19. Defendant Samantha served a Secretary on the board of Deposition Technology, Ltd. from September 9, 2005 to the present.

20. Defendant Marion transitioned to Likido Green Energy as its Administrative and Human Resource Manager. Defendant Marion's employment was terminated as a result of the conduct complained of herein

on November 8, 2024. (A true and correct copy of Marion's job description is attached hereto as **Exhibit "F").**

21.    In or around March of 2023, discussions began by and between Likido and Apclen Spain, a Spanish company, for its purchase of four Likido heat pump units.  These discussions involved Roberto Garcia, who at the time was a consultant to Apclen (Mr. Garcia was formerly a partner) and Stephane Moya, a managing partner of Apclen.

22.    On or about March 24, 2023, Likido began the process of shipping the four Likido heat pumps from the manufacturer in Scotland to the assembly unit in Spain so that the units could be assembled and tested prior to being shipped to the customer, Apclen.  ( A true and correct copy of Commercial Invoice dated March 24, 2023 is attached hereto as **Exhibit "G").**

23.    The total anticipated revenue for the sale of the Likido units was approximately $634,184.17 US currency (€485,340.00 GBP) as set forth in the March 31, 2023 Tax Invoice issued by Likido.  (A true and correct copy of the 3-31-23 Invoice is attached hereto as **Exhibit "H").**

24.    On or about April 4, 2023 Kerry Logistics, a United Kingdom company, issued a Delivery of Goods receipt indicating that 4 items (3 x 1488kg Mechanical Assembly and 1x 650kg control panels were being shipped to the Glasgow Prestwick Airport in Scotland. (A true and correct copy of the 4-4-23 Delivery of Goods confirmation and photos of the products being shipped are attached hereto as **Exhibit "I").**

25.    On or about August 21, 2023, Likido, at the request of its auditors Macias, Gini & O'Connell, LLP, sent a letter to Apclen Spain to confirm that it was indebted to Likido for the sum of the €485,340. This letter was executed by Roberto Garcia on September 8, 2023 on behalf of Apclen, for whom he was still a consultant. (A true and correct copy of the 8-21-23 Letter is attached hereto as **Exhibit "J").**

26.    On September 7, 2023, Mr. Garcia was offered a position with a DFCO subsidiary in Spain, namely, Dalrada Technology Spain, as its Commercial Sales Director.  Mr. Garcia accepted the position

on September 8, 2023 and officially began his employment on or about September 11, 2023. (A true and correct copy of the Employment Contract is attached hereto as **Exhibit "K").**

27. In an effort to assist Apclen with a smooth transition and conclude the transaction of the purchase of the four Likido units by Apclen, Mr. Garcia remained a consultant for Apclen until December 2023 at which time he had officially resigned.

28. The revenue for the transaction in the amount of €485,340 was recorded by Likido Ltd. for the end of the quarter March 31, 2023 since the units had been removed from the facility and were in the process of being shipped.

29. However, during the audit at the end of June 30, 2024, the accounts receivable remained unpaid and its collectability was determined to be questionable. As such, the revenue was written off as a bad debt expense and the units were returned to Scotland.

30. On or about October 12, 2023 William approved, executed and submitted the Financial Statement for Likido Ltd. to Companies House, the United Kingdom's official register of companies which is responsible for the regulation and administration of UK companies. It is an executive agency of the Department for Business and Trade. (A true and correct copy of the June 30, 2023 Financial Statement is attached hereto as **Exhibit "L").**

31. Included in the Financial Statement is a two-page Director's Report. (**Exh. L**; pgs. 1-2). Within this report, William states "Each person who is a director at the date of the approval of this report confirms that: so far as they are aware, there is no relevant audit information of which the company's auditor is unaware; and they have taken all steps that they ought to have taken as a director to make themselves aware of any relevant audit information and to establish that the company's auditor is aware of that information."

32. Additionally, the conclusion of the Director's Report states "This report was approved by the board of directors on 12 October 2023 and signed on behalf of the board by William Bonar."

33. In early December 2023, William advised the board members of DFCO that he had filed a complaint with the Securities and Exchange Commission("SEC") alleging, among other things, financial misconduct, forging documentation and market manipulation. William particularly singles out David Pickett, an employee of Plaintiff, as the person he believes has committed the acts complained of despite providing no proof of these allegations.

34. On or about December 24, 2023, William submitted an email to Julie Neill, who is head of the third-party Human Resources Department for DFCO, namely, Trucept. The email reiterates that he has initiated a complaint with the SEC. (A true and correct copy of the December 24, 2023 email chain is attached hereto as **Exhibit "M").**

35. William also provided documents and expressed his concerns in December 2023 to the DFCO board members and to the auditors. These documents included the following:

1. Invoice No. INV-0140 for crating Apclen Units
2. Invoice No. INV-0165 Apclen Invoice
3. Apclen documents, including photographs of the units being shipped
4. Proof of Delivery Job No. 1057925-Original
5. Proof of Delivery Job No. 1057925-Modified
6. Email regarding Spain shipment and update from shipper
7. Transfer quote from Magnetix

36. Once the DFCO Board received William's complaints, an Audit Committee was formed to investigate his claims on or about December 2023. The committee consisted of the Board's Directors Vincent Monteparte and Anthony Zolezzi.

37. In addition to forming an Audit Committee to investigate William's concerns and allegations, Plaintiffs retained attorney Kym LeGolvan, an attorney workplace investigator, to look into the matter. William also sent his 'investigative file' to Ms. LeGolvan.

38. On or about December 20, 2023, William sent an email to Anthony Zolezzi (DFCO Director and Audit Committee appointee) basically demanding that DFCO either "do it the way we have it laid out in the document I sent and involve the bigger team in the whole process, the rest of my requests are agreed to and changes implemented, or David (Pickett) is removed or sidestepped for his misconduct. I will not accept anything less." (A true and correct copy of the December 20, 2023 email is attached hereto as **Exhibit "N").**

39. In the same December 20, 2023 email chain, William again emails Vincent Monteparte and Anthony Zolezzi a follow-up email stating that he is 'disappointed' that there has been no response on December 21, 2023. In follow-up, Monteparte replies also on December 21, 2023 stating that they had just spoken on Monday and that William was assured that his concerns would be investigated. Monteparte also points out that this was all taking place over the holidays so it would take longer.

40. On December 24, 2023, Mr. Zolezzi responds to William's December 21, 2023 statement assuring him that his concerns are being taken very seriously, but also calling William out on his obvious personal issues with David Pickett. William was informed that personality issues are not dealt with through termination or suspension. Zolezzi also request that William provide any and all additional documentation he may have to support his allegations. No such documentation was ever received by Plaintiff.

41. On January 4, 2024 Human Resources Director Rachel Henton conducted an interview with William to discuss his concerns. (A true and correct copy of the Investigation Notes is attached hereto as **Exhibit "O").**

42.     During the interview, William admits that shipping of the Likido units occurred in March 2023 and that the order was completed using two existing units located in Spain and two that were eventually completed.

43.     At all times relevant hereto, William has alleged that a shipping document from Caledonian Freight was altered to change the shipping date from the original date of June 29, 2023 to March 29, 2023 for the purpose of Likido being able to claim the revenue from the Apclen sale in the first quarter. (A true and correct copy of the original and allegedly modified Caledonian Freight invoices are attached hereto as **Exhibit "P").** These allegations are made by William despite his having confirmed that the Likido units were indeed shipped from the facility in Scotland.

44.     On February 2, 2024, attorney Kym LeGolvan sent an email stating that her findings regarding the altered document was "inconclusive and that the evidence available, all of which was provided by William, did not prove or disprove that the documents were falsified".

45.     On or about January 16, 2024 Plaintiff submitted an 8k filing which notified the SEC of the concerns. After the conclusion of the investigation by February 2, 2024, an updated 8k was filed indicating that no issues were found.

46.     On or about September 10, 2024, William sent a letter to the Likido board members again raising the same issues previously investigated, namely his accusations of fraudulent documents being provided to the UK and corporate auditors.  In response, an emergency Likido board meeting was called on September 12, 2024 and a subsequent investigation ensued.

47.     As part of the investigation, DFCO CEO Brian Bonar had a telephone conversation with the UK auditors whose opinion it was that they were satisfied with the information provided to date and that they were continuing to provide audit support despite William's claims that they were suspending all work for the company due to William's claims of potential misconduct on the part of DFCO.  The auditors were

also satisfied with the documentation provided regarding the debt write-off in June 2024 for the Apclen transaction.

48. In September 2024 Plaintiff discovered that all of the emails and Whatsapp posts for UK employee Steven Friel had been deleted from the company's server. It should be noted that Mr. Friel was involved in and cc'd on numerous emails transmissions regarding the Apclen transaction and subsequent submissions of documents to the UK auditors and worked directly under William.

49. On September 30, 2024, William sent an email to Plaintiff's United States auditors setting forth his previous concerns, but again provided no documentary evidence to support these claims. Included in this email was accusations that documents previously provided to the auditors were not the original documents and that they had been altered and then provided to the auditors by Mr. Pickett. Again, William failed to provide any evidence to support these claims. Furthermore, it should be noted that the documents provided to the US auditors were originally provided by Steven Friel.

50. Additionally, William makes the false claim in his September 30, 2024 lengthy dissertation that he was bullied and harassed for having filed a complaint with the DFCO board and SEC. He further states that he was dismissed from the company and that his access to company emails was removed. However, William was not terminated from employment. He tendered his resignation from employment on August 30, 2024 and his Board of Directors resignation on September 30, 2024 which he even admits in this email. Furthermore, it is company policy upon an employee's termination to cancel any access they have to company emails. (A true and correct copy of the September 30, 2024 email is attached hereto as **Exhibit "Q")**.

51. In October 2024, Plaintiff's US auditors resigned and Plaintiffs were forced to find another audit firm. Additionally, Plaintiffs have been forced to retain legal counsel in the UK to assist them in dealing with William's continuous false claims and harassment thereby incurring additional costs and fees.

52.     In or around October 15, 2024, Plaintiffs received notification that William has been contacting Likido employees falsely stating that the company is only going to be able to operate for another 92-days, prompting concern among employees.

53.     On October 21, 2024, CEO Brian Bonar received an email from Scotland employee Jamie Queen with two notification letters from HMRC (His Majesty's Revenue & Customs) which is a national taxing authority for the United Kingdom. The letters referenced an unpaid tax invoice for Deposition Technology Ltd for the period ending March 31, 2022. The amount due and owing is €108577.32 ($140,954.59 in US dollars). This was for a tax period prior to Plaintiffs' purchase of the company from William. This debt was never disclosed to Plaintiffs. (A true and correct copy of this notice is attached hereto as **Exhibit "R").** The notice specifically states that numerous letters had been sent out to never responded to indicating that William was aware of this tax debt all along and failed to disclose it to Plaintiffs.

54.     The second notice received states that the Research and Development claim submitted for the accounting period from April 1, 2021 to March 31, 2022 was rejected. (A true and correct copy of this notice is also attached hereto as **Exhibit "S").**

55.     Since William initiated the second investigation and filed various complaints, Plaintiff's stock price has plummeted, at one point dropping from $0.17 to $0.01. which is an estimated share price loss to Plaintiffs in the amount of approximately $7,200,000.00.

56.     On or about October 29, 2024, Plaintiff received information from its team at a job site in Switzerland that William had contacted Plaintiff's client and had made very disparaging remarks about the company (Plaintiff) and the lack of probability that the job would ever be completed. The clients became concerned and reached out to an employee of Plaintiff to discuss those concerns.

57.     On or about November 1, 2024 Plaintiff inadvertently received an email regarding a meeting with William, Jillian and potential Ian discussing Plaintiff's EVOS units.  William nor any of the other defendants have the right or title or authority to sell, encumber, transfer or enter into any agreements

thereon to Plaintiff's property. ( A true and correct copy of the November 1, 2024 email is attached hereto as **Exhibit "T"**).

58. It became known to Plaintiff in October 2024 that Dylan had personally interfered with the sale of 75 heat pump units basically ordering other employees to stop selling the units. Dylan stated to employees that he did not 'consider that the business was viable going forward'.

59. It also became known to Plaintiff that William had begun contacting Plaintiff's customers with the intent to interfere with customer relations.

60. Once William left the company, Defendant Marion has created a hostile work environment at Plaintiff's facility in Scotland. Marion was upset that she was not included in an interview of a potential employee and commented that it didn't matter because "the business isn't even going to be here in six weeks".

61. Following William's departure from the company, Defendant Samantha, who had been on a long-term sick leave, joined William, Ian and Marion in litigation in the United Kingdom challenging the terms of the Purchase Agreement for Silicon Services Consortium, some two years after the agreement was executed and implemented.

62. At all times relevant hereto, Defendants, and each of them, have had continuous access to company systems, manuals, proprietary information, trade secrets and confidential information. It should be noted that even while on a leave of absence, Samantha had been accessing the company systems although offsite.

63. Along with the deleted email and Whatsapp conversations involving Steven Friel, numerous items are now missing from the Scotland facility, including but not limited to, employment manuals, proprietary drawings, technical manuals regarding the installation, maintenance and repair of the heat pump units. These items were discovered to have been removed from the facility during a site visit to the facility in September 2024 conducted by two of Plaintiff's United State representatives, namely Anthony Zolezzi and Julie Neill just prior to William's departure following his resignation.

64. Furthermore, Defendants, and each of them, have failed and/or refused to turn over all of the corporate books associated with Dalrada Technology, Ltd., Deposition Technology, Ltd., Silicon Services Consortium and Likido Ltd despite numerous requests having been made.

65. As a direct and proximate result of Defendants' conduct, and others, Plaintiff has incurred damages in an amount to be determined at trial.

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty**

66. Plaintiffs incorporate by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

67. A board of directors owes fiduciary duties to a corporation, primarily a duty of care, duty of loyalty and duty of obedience which means they are required to act with reasonable care, prioritize the company's best interests above their own and comply with the organization's rules and laws when making decisions. A director also must disclose relevant information to the board and shareholders.

68. Defendant William Bonar and Ian Robert Mackenzie have engaged in conduct that has breached these duties, including but not limited to (1) failing to exercise reasonable care and diligence in the management of the company's affairs;(2) Engaging in self-dealing transactions that benefitted Defendants to the detriment of the company and its shareholders; (3) Failing to disclose material information necessary for the board to make informed decisions; and misusing corporate assets for his own personal benefit.

69. Although William raised concerns about misconduct by Plaintiffs surrounding the Apclen transactions, he did not bring this to anyone's attention until approximately five months after the Apclen transaction had taken place, and two months after he personally approved the Likido financial statement which included the Apclen revenue he now questions.

70. Since the beginning of 2023 Plaintiffs have transferred at least $5,000,000.00 to Likido Ltd and $2.5 million to Deposition Technology. Yet both companies have failed to produce enough revenue to reimburse Plaintiffs while under the leadership of William.

71. Additionally, since Plaintiffs purchase of the companies, William has continued to block or remove access to various programs essential to transparency such as RemotePC, CSI/UARK and Bonus support, despite repeated requests by Plaintiffs that he allow the parent company access to these and other programs.

72. Additionally, William blocked access to Likido and Deposition Technology Ltd's social media accounts such as Linkdin, thereby preventing the marketing team's access to these sites.

73. Furthermore, William had refused to allow access to Companies House in the United Kingdom by not providing the authentication codes required for access, which permitted Plaintiffs to update information, add or remove directors, submit accounting reports and yearly statements. This precluded Plaintiff from being in compliance with Companies House regulations that any and all changes must be made within 14-days of changes being made which now exposes Plaintiff to potential fines and fees.

74. William continues to file false reports, make unsubstantiated claims regarding misconduct by Plaintiffs which has led to a significant drop in the Plaintiffs' stock price and caused the resignation of Plaintiffs' auditing firm, the incurring of substantial legal fees, the loss of employees and damage to Plaintiffs' reputation.

75. Defendant Ian, by participating with the other Defendants in reaching out to potential customers of Plaintiff or direct competitors, has breached his obligations to Plaintiff.

76. Defendants William and Ian have breached their fiduciary duties as directors and these breaches have caused significant harm to Plaintiff and its shareholders and Plaintiffs now seek damages and other appropriate remedies.

## SECOND CAUSE OF ACTION

**Business Disparagement**

77. Plaintiffs incorporate by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

78. Beginning in December 2023, Defendant William made and published false, misleading and disparaging statements regarding Plaintiffs, its corporate executives without evidence to support his baseless claims.

79. William has and continues to make disparaging remarks and meritless accusations against Plaintiff to its current and potential customers and current employees.

80. These statements, as set forth above and as evidenced in attached exhibits, were made to specific audiences such as the SEC and Plaintiff's auditors with the intent to harm Plaintiffs.

81. Defendant William knew or should have known that the statements were false or acted with reckless disregard for their truth or falsity.

82. As a direct and proximate result of Defendant's statements, Plaintiffs have suffered substantial harm, including, but not limited to, loss of business, damage to reputation, loss of prospective business relations and financial harm in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

**Defamation**

83. Plaintiffs incorporate by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

84. Beginning in December of 2023, Defendant William published and/or caused to be published, false statements concerning Plaintiff, its executive body and its employees.

85. The statements were made in writing and verbally through online media and print and included but not limited to false accusations regarding misconduct, falsification of documents, and unethical conduct.

86. The statements uttered by this Defendant were false and defamatory because there was no evidence whatsoever to substantiate Defendant's claims.

87. The statements portrayed Plaintiffs in a false light that would tend to lower Plaintiffs' reputation in the eyes of the business community.

88. Defendant William acted with actual malice, reckless disregard and negligence in publishing these false statements, knowing they were untrue or acting with reckless disregard for their truth or falsity.

89. As a direct and proximate result of Defendant William's defamatory statements, Plaintiff has suffered damage to their business reputation; and (2) loss of business opportunities and potential revenue.

90. Furthermore, this Defendant's false statements placed Plaintiffs in a false light before the public, its employees, and vendors by implying wrong-doing by Plaintiffs.

91. The statements were highly offensive to a reasonable person and Defendant acted with actual malice or reckless disregard for the falsity of the statements.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Contractual Relations

92. Plaintiffs incorporate by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

93. Plaintiffs had an existing business relationship with its US auditors which handled all of Plaintiffs' corporate audits and required compliance filings with various government agencies.

94. On or about September 30, 2024 Defendant William intentionally and improperly interfered with this business relationship. The auditors resigned from handling Plaintiffs corporate audits shortly after

receiving an email from this Defendant which contained nothing but false information and unsubstantiated accusations. They did so at a critical time during the yearly audit process and just prior to filing deadlines.

95. Furthermore, William has contacted current customers under contracts with Plaintiff with the intent to interfere with business relationships and deprive Plaintiff of revenue.

96. Defendant's conduct was intentional and meant to inflict significant disruption of Plaintiffs business operations and to cause financial harm.

97. As a direct and proximate result of Defendant's interference, Plaintiffs have suffered economic damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Fraud-Intentional Misrepresentation

98. Plaintiffs incorporate by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

99. Beginning in December 2023, Defendant William made material misrepresentations to Plaintiffs regarding a transaction that occurred by and between Plaintiff Likido and Apclen Spain. Defendant brought these unfounded claims before the Board of Directors, the SEC, numerous employees and third-party contractual relationships. Defendant William wrongfully and intentionally misrepresented evidence, documents, etc. associated with this transaction.

100. These misrepresentations included unsubstantiated allegations of falsifying documents and then submitting them to Plaintiffs auditors. Despite the fact that following a thorough internal and external investigation no wrongdoing was found, Defendant continued, and still does continue to spread this misinformation with the actual intent to cause harm to Plaintiffs.

101. Additionally, on or about April 2022, when Plaintiff was purchasing Defendant William's UK company, Deposition Technology Ltd., he represented to Plaintiffs that he had disclosed any and all debts and liabilities for the company. This turned out to be false.

102. On October 21, 2024, Plaintiffs received two notices from the HMRC, a UK tax agency, that an unpaid debt in the amount of $140,954.59 was incurred for the tax period ending March 31, 2022 which was never disclosed to Plaintiffs prior to purchasing the company.

103. This representation was made with the intent to deceive Plaintiffs and induce reliance upon the false statement.

104. Plaintiff justifiably and reasonably relied upon Defendant's misrepresentation and in such reliance, took action that resulted in purchase of Defendant's company with an undisclosed debt.

105. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs have incurred damages in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**Breach of Duty of Care**

106. Plaintiffs incorporate by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

107. Defendants, due to their statuses as employees and as a directors, owed a duty of care to Plaintiffs to provide accurate information.

108. Defendants breached this duty by providing false, inflammatory information without a reasonable basis for believing it was true.

109. As a result of this breach, Plaintiffs have incurred damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**Tortious Interference with Business Relations-Harassment**

110. Plaintiff incorporates by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

111. Beginning in December 2023, William intentionally engaged in a pattern of harassment, false accusation against Plaintiff, its business practices and operations, and its employees designed to interfere with Plaintiff's contractual relationships, customers and business operations.

112. The conduct of William included, but was not limited to, publication of false information, false accusations which were known to William to be false, contacting Plaintiffs business associates, board of directors, shareholders and employees in an effort to spread this false information with the intent of disrupting these relationships.

113. William has also engaged in defamation of Plaintiff, its operations, and its products to unfairly undermine Plaintiff's businesses.

114. Defendants' actions were willful, malicious, and intended to cause the ultimate economic harm to Plaintiff. As a result of said conduct, Plaintiff has suffered financial loss, including lost contracts, employees, damaged business relationships and reputational harm.

**EIGHTH CAUSE OF ACTION**

**Misappropriation of Trade Secrets**
**[18 U.S.C. §1836 and California Civil Code §3426]**

115. Plaintiff incorporates by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

116. Plaintiff is in the business of the manufacturing, sales and installation of green energy heat pumps throughout the United Kingdom, Europe and the United States. As such, Plaintiff has developed proprietary trade secrets, including but not limited to customer lists, product designs, manufacturing processes, maintenance manuals regarding Plaintiff's patented designs.

117. Plaintiff's trade secrets derive independent economic value from not being known to others and Plaintiff has taken reasonable measures, including confidentiality agreements, to protect its information.

118. Defendants William, Marion, Samantha, Ian and Jillian were all employees of DFCO and had access to Plaintiff's trade secrets subject to strict confidentiality obligations.

119. Plaintiff discovered that Defendants, after leaving Plaintiff's employment, disclosed its trade secrets to other parties for the purpose of misappropriation. Defendants further have engaged in conversations with potential customers without the knowledge or permission of Plaintiff in an effort to personally benefit from Plaintiff's trade secrets.

120. Furthermore, numerous confidential documents, including but not limited to manuals and designs for the Likido machines and other proprietary information, are now missing from the Scotland facility.

121. Defendants acquired, used and disclosed Plaintiff's trade secrets in violation of confidentiality obligations and conspired with other Defendants to improperly use these trade secrets.

122. Plaintiff's proprietary information also constitutes trade secrets under the California Uniform Trade Secrets Act ("CUTSA") pursuant to *California Civil Code* § 3426 et seq.

123. Defendants misappropriated Plaintiff's trade secrets by unauthorized acquisition, use and disclosure in violation of CUTSA.

124. Defendants, and each of them, acted with malice and in concert with one another to misappropriate Plaintiff's trade secrets, entitling Plaintiff to damages, exemplary damages, and attorney's fees under CUTSA.

## NINTH CAUSE OF ACTION

### Conspiracy to Misappropriate Trade Secrets under the Defend Trade Secrets Act (18 U.S.C. § 1832(a)(5)

125. Plaintiff incorporates by reference all of the preceding paragraphs on this Complaint as if fully set forth herein.

126. Defendants knowingly and willfully conspired to misappropriate Plaintiff's trade secrets in violation of the Defend Trade Secrets Act ("DTSA").

127. Defendants have shared Plaintiff's trade secrets with others, intending for them to use the information to compete with Plaintiff.

128. Defendants' conspiracy to misappropriate Plaintiff's trade secrets has caused and continues to cause Plaintiff significant damage, and Plaintiff is entitled to relief under 18 U.S.C. §1832(a)(5).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1. Actual damages in an amount to be determined upon proof at trial;
2. Special damages in an amount to be determined upon proof at trial;
3. Equitable Disgorgement;
4. Exemplary damages in an amount to be determined upon proof at trial;
5. Reasonable attorney's fees and costs of suit;
6. Injunctive relief enjoining Defendants from using, disclosing, or further disseminating Plaintiff's trade secrets;
7. Pre-judgment and post-judgment interest at the highest legal rate; and
8. For such other relief as the Court may deem just and proper.

Dated: November 12, 2024

**FLETCHER ROBBE INTERNATIONAL**
**ATTORNEYS AT LAW**

By: Fletcher Robbe

Fletcher A. Robbe, Esq.
Attorney for Plaintiffs

**VERIFICATION**

I, Brian Bonar, am the Chief Executive Officer for Plaintiffs in this matter. I have read the foregoing COMPLAINT FOR DAMAGES and know its contents.

The matters stated in the Complaint for Damages are true based on my own knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 15th day of November, 2024 at Escondido, California.

By: ______________________
Brian Bonar