1
2
3
4
5
6
7
8
9

10    UNITED STATES DISTRICT COURT

11    SOUTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13 DALRADA FINANCIAL | Case No.:  24-cv-2166-WQH-BLM |
| 14 CORPORATION, a Wyoming corporation; and DEPOSITION | **ORDER** |
| 15 TECHNOLOGY LTD., a United | |
| 16 Kingdom company and wholly owned subsidiary of Dalrada Financial Corp., | |
| 17 Plaintiffs, | |
| 18 vs. | |
| 19 WILLIAM IAN MARTIN BONAR, as an | |
| 20 individual and in his official capacity; MARION BONAR, as an individual and | |
| 21 in her official capacity; IAN ROBERT MACKENZIE, as an individual and in his | |
| 22 official capacity; SAMANTHA | |
| 23 MACKENZIE, as an individual and in her official capacity; JILLIAN HUGHES, as | |
| 24 an individual and in her official capacity; and DOES 1–50, inclusive, | |
| 25 | |
| 26 Defendants. | |

27  HAYES, Judge:

28                                    1

The matters before the Court are: (1) Specially Appearing Defendant Marion Bonar's Motion to Dismiss for Lack of Personal Jurisdiction Under Rule 12(b)(2) (ECF No. 6); (2) Specially Appearing Defendant Samantha Mackenzie['s] Motion to Dismiss for Lack of Personal Jurisdiction Under Rule 12(b)(2) (ECF No. 7); (3) Specially Appearing Defendant Ian Robert Mackenzie's Motion to Dismiss for Lack of Personal Jurisdiction Under Rule 12(b)(2) (ECF No. 8); (4) Specially Appearing Defendant Jillian Hughes' Motion to Dismiss for Lack of Personal Jurisdiction Under Rule 12(b)(2) (ECF No. 9); (5) the Special Motion to Strike (Anti-SLAPP – Cal. Civ. Proc. Code § 425.16) (ECF No. 10) filed by Defendants William Ian Martin Bonar ("William Bonar"), Marion Bonar, Ian Robert Mackenzie ("Ian Mackenzie"), Samantha Mackenzie, and Jillian Hughes (collectively, the "Anti-SLAPP Defendants"); and (6) the Motion to Strike New Arguments and Personal Identifying Information from Defendants' Reply to Plaintiffs' Opposition to Special Motion to Strike and their Replies to Plaintiffs' Opposition to Motions to Dismiss filed by Plaintiffs Dalrada Financial Corporation ("DFCO") and Deposition Technology, Ltd. ("Deposition Tech.") (collectively, "Plaintiffs") (ECF No. 24).

## I.    PROCEDURAL BACKGROUND

On November 19, 2024, Plaintiffs initiated this action by filing a Complaint against Defendants William Bonar, Marion Bonar, Ian Mackenzie, Samantha Mackenzie, Jillian Hughes, and Does 1–50 (collectively, "Defendants"). (ECF No. 1, Compl.)

On December 30, 2024, Defendants Marion Bonar, Samantha Mackenzie, Ian Mackenzie, and Jillian Hughes (collectively, the "Specially Appearing Defendants") specially appeared to file respective Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2). (ECF Nos. 6–9.) On February 24, 2025, Plaintiffs filed respective Responses in Opposition to the Specially Appearing Defendants' Motions to Dismiss. (ECF Nos. 14–17.) On March 3, 2025, the Specially Appearing Defendants filed respective Replies. (ECF Nos. 19–22.)

On December 30, 2024, the Anti-SLAPP Defendants filed the Special Motion to

Strike (Anti-SLAPP – Cal. Civ. Proc. Code § 425.16) (the "Anti-SLAPP Motion to Strike"). (ECF No. 10.) On February 19, 2025, Plaintiffs filed a Response in Opposition to the Special Motion to Strike. (ECF No. 12.) On March 3, 2025, the Anti-SLAPP Defendants filed a Reply. (ECF No. 18.)

On March 6, 2025, Plaintiffs filed the Motion to Strike New Arguments and Personal Identifying Information from Defendants' Reply to Plaintiffs' Opposition to Special Motion to Strike and their Replies to Plaintiffs' Opposition to Motions to Dismiss (the "Motion to Strike Arguments in Defendants' Replies"). (ECF No. 24.) On March 10, 2025, Defendants filed a Response in Opposition to the Motion to Strike Arguments in Defendants' Replies. (ECF No. 26.) On March 11, 2025, Plaintiffs filed a Reply. (ECF No. 27.)

## II.    ALLEGATIONS IN THE COMPLAINT

The allegations in the Complaint concern events surrounding Plaintiffs DFCO and Deposition Tech., as well as a number of DFCO's subsidiaries: Silicon Services Consortium, Likido Ltd., Dalrada Technology Ltd., Likido Green Energy, and Dalrada Technology Spain.

"On or about April 4, 2022, Plaintiff purchased Deposition Technology LTD, a United Kingdom company from Defendant, William Bonar" and Silicon Services Consortium from Defendants William Bonar, Marion Bonar, Ian Mackenzie, and Samantha Mackenzie. (Compl. ¶¶ 11–12.)

On or about March 1, 2023, Plaintiff "purchased Dalrada Technology Ltd. from William Bonar and Pauline Gourdie." *Id.* ¶ 13.

William Bonar is a resident of Scotland and was "an employee of DFCO as its Vice President of Worldwide Manufacturing, Research and Development" at the Scotland Facility and "a Director on the Board of [ ] Likido Ltd., Deposition Technology, Ltd., Silicon Services Consortium, and Dalrada Technology, Ltd.," subsidiaries of DFCO, until his resignation on September 30, 2024. *Id.* ¶¶ 2, 4, 16.

Marion Bonar is a resident of Scotland and was the Human Resources Manager for Likido Green Energy, a subsidiary of DFCO, until her employment was terminated on November 8, 2024. *Id.* ¶¶ 2, 5, 20.

Ian Mackenzie is a resident of the UK and was a director of Deposition Tech., Dalrada Technology, Ltd., Silicon Services Consortium, and Likido Ltd., subsidiaries of DFCO, until his resignation on October 8, 2024. *Id.* ¶¶ 2, 6, 15.

Samantha Mackenzie is a resident of the UK and has been the Finance and Office Administrator of Deposition Tech., as well as the Secretary on the board of Deposition Tech., a subsidiary of DFCO, from September 9, 2005 to the present. *Id.* ¶¶ 2, 7.

Jillian Hughes is a resident of Scotland and was the Chief Operating Officer and Interim Chief Financial Officer for Dalrada Technology, Ltd., a subsidiary of DFCO, until her resignation on August 29, 2024. *Id.* ¶¶ 2, 8, 17.

In March of 2023, Likido Ltd. entered discussions with Apclen Spain—a Spanish company—regarding the sale of four heat pump units. The discussions involved Roberto Garcia, then a consultant and former partner of Apclen, and Stephane Moya, a managing partner. *Id.* ¶ 21.

On March 24, 2023, Likido Ltd., a subsidiary of DFCO, initiated shipment of the units from its manufacturer in Scotland to an assembly facility in Spain, where they were to be assembled and tested before delivery to Apclen. *Id.* ¶ 22. A Delivery of Goods receipt dated April 4, 2023, confirmed that four items were being transported to Glasgow Prestwick Airport in Scotland. *Id.* ¶ 24.

As of March 31, 2023, Likido Ltd. recorded revenue of €485,340.00 GBP (approximately $634,184.17 USD) for the transaction "since the units had been removed from the facility and were in the process of being shipped." *Id.* ¶ 28. On August 21, 2023, at the request of its auditors, Likido Ltd. sent a letter to Apclen confirming the amount owed. *Id.* ¶ 25. Roberto Garcia executed the confirmation on September 8, 2023. *Id.* However, an audit later confirmed that Apclen ultimately never paid Likido Ltd. for the

1  goods. *See id.* ¶ 29.

2      Around the same time, on September 7, 2023, Roberto Garcia was offered a role as
3  Commercial Sales Director at Dalrada Technology Spain, a DFCO subsidiary, which he
4  accepted the next day. *Id.* ¶ 26. He continued as a consultant for Apclen until his official
5  resignation in December of 2023. *Id.* ¶ 27.

6      On or about October 12, 2023, Defendant William Bonar approved, executed, and
7  submitted Likido Ltd.'s Financial Statement for the fiscal year ending June 30, 2023, to
8  Companies House—the United Kingdom's official corporate registry and an executive
9  agency of the Department for Business and Trade. *Id.* ¶ 30. Included within the Financial
10 Statement is a two-page Director's Report. *Id.* ¶ 31. In this report, William Bonar affirms
11 that, to the best of each director's knowledge, there was no relevant audit information of
12 which the company's auditor was unaware, and that all reasonable steps had been taken to
13 ensure the auditor had access to such information. *Id.* The report concludes: "'This report
14 was approved by the board of directors on 12 October 2023 and signed on behalf of the
15 board by William Bonar.'" *Id.* ¶ 32.

16     "In early December 2023, William advised the board members of DFCO that he had
17 filed a complaint with the Securities and Exchange Commission ('SEC') alleging, among
18 other things, financial misconduct, forging documentation and market manipulation." *Id.*
19 ¶ 33. In his allegations, William specifically named David Pickett—an employee of
20 DFCO—as the individual responsible for these acts, although he did not provide supporting
21 evidence for these claims. *Id.*

22     In addition to forming an Audit Committee to investigate William's allegations,
23 DFCO retained attorney Kym LeGolvan, a workplace investigator, to examine the matter.
24 *Id.* ¶ 37. William provided a self-compiled "investigative file" to Kym LeGolvan to assist
25 with her investigation. *Id.*

26     On or about December 20, 2023, William sent an email to DFCO Board Director
27 Anthony Zolezzi, "demanding that DFCO either 'do it the way we have it laid out in the

28                                         5

document I sent and involve the bigger team in the whole process, the rest of my requests are agreed to and changes implemented, or David (Pickett) is removed or sidestepped for his misconduct. I will not accept anything less.'" *Id.* ¶ 38.

In the same email chain a day later, William followed up with DFCO Board Directors Vincent Monteparte and Anthony Zolezzi, expressing disappointment over not receiving a response. *Id.* ¶ 39. That same day, Vincent replied, reminding William that he had been assured his concerns would be investigated. *Id.* Vincent also noted that the timing of William's complaint would naturally delay the process, due to the holiday season. *Id.*

On December 24, 2023, Anthony responded again, assuring William that his concerns were being taken seriously and addressing what he described as William's apparent personal issues with David Pickett, stating that personality conflicts would not justify termination or suspension. *Id.* ¶ 40. He further requested that William submit any additional documentation supporting his claims, but no further documentation was provided. *Id.*

On or about December 24, 2023, William reiterated his allegations in an email to Julie Neill, head of Human Resources for DFCO's third-party HR provider, Trucept. *Id.* ¶ 34. He also submitted additional materials and expressed his concerns to both the DFCO board and the company's auditors. *Id.* ¶ 35. Following receipt of William's complaints, the DFCO Board established an Audit Committee in or around December 2023 to investigate the allegations. *Id.* ¶ 36. The committee was composed of DFCO Board Directors Vincent Monteparte and Anthony Zolezzi. *Id.*

William has consistently alleged "that a shipping document from Caledonian Freight was altered to change the shipping date from the original date of June 29, 2023 to March 29, 2023 for the purpose of Likido being able to claim the revenue from the Apclen sale in the first quarter." *Id.* ¶ 43. However, "[o]n January 4, 2024, Human Resources Director Rachel Henton conducted an interview with William to discuss his concerns" where William admitted that "shipping of the Likido units occurred in March 2023 and that the

24-cv-2166-WQH-BLM

order was completed using two existing units located in Spain and two that were eventually completed." *Id.* ¶¶ 41–42.

"On or about January 16, 2024 [DFCO] submitted an 8k filing which notified the SEC of [William's] concerns." *Id.* ¶ 45. By February 2, 2024, Kym LeGolvan, the workplace investigator, had concluded her investigation, finding it "inconclusive" and stating that the available evidence—provided entirely by William—"did not prove or disprove that the documents were falsified." *Id.* ¶ 44. Following the investigation's conclusion, an updated 8-K was filed with the SEC indicating that no issues had been found. *Id.* ¶ 45.

As of June 30, 2024, an audit discovered that Apclen had not paid Likido Ltd. the amount owed for the four heat pump units that Likido Ltd. had previously recorded in revenue, and the accounts receivable was deemed questionable. *Id.* ¶ 29. As a result, Likido Ltd. wrote off the revenue as a bad debt expense and returned the units to Scotland. *Id.*

On or about September 10, 2024, William sent a letter to the Likido Ltd. board reiterating the same claims, including accusations of fraudulent documents being submitted to both the UK and corporate auditors. *Id.* ¶ 46. In response, Likido Ltd. held an emergency board meeting on September 12, 2024, and a follow-up investigation was initiated. *Id.*

As part of the investigation, DFCO CEO Brian Bonar spoke with the UK auditors who stated that they were "satisfied with the information provided to date" and that they intended to continue to provide audit support to the company, "despite William's claims that [the auditors] were suspending all work for this company due to" DFCO's potential misconduct. *Id.* ¶ 47. They also confirmed that they were "satisfied with the documentation provided regarding the debt write-off in June 2024 for the Apclen transaction." *Id.*

On September 30, 2024, William sent an email to DFCO's U.S. auditors reiterating his prior concerns and accusing David Pickett of providing altered documents to the auditors. *Id.* ¶ 49. However, William again failed to provide any documentary evidence supporting his claims. *Id.*

In the same lengthy email, William falsely claimed he was bullied and harassed for filing complaints with the DFCO board and the SEC. *Id.* ¶ 50. "He further state[d] that he was dismissed from the company" and that his email access had been revoked. *Id.* However, William voluntarily resigned from employment on August 30, 2024, and from the Board of Directors on September 30, 2024—facts he acknowledged in the email. *Id.* His email access was revoked in accordance with company policy, which mandates termination of email access upon any employee's resignation or termination. *Id.*

In October of 2024, DFCO's U.S. auditors resigned, requiring the company to retain a new audit firm. *Id.* ¶ 51. DFCO also had to engage legal counsel in the UK to address William's ongoing false claims and harassment, resulting in additional costs and fees. *Id.*

In or around October 15, 2024, Plaintiffs learned that William had been contacting Likido Ltd. employees and spreading false information that the company would cease operations within ninety-two days, causing concern among the staff. *Id.* ¶ 52.

On October 21, 2024, DFCO CEO Brian Bonar received an email from a Scotland employee with two letters from His Majesty's Revenue & Customs ("HMRC"), the UK's taxing authority. *Id.* ¶ 53. The first notice referenced an unpaid tax debt of €108,577.32 (approximately $140,954.59 USD) for Deposition Tech. for the period ending March 31, 2022—a time preceding DFCO's acquisition of the company from William on April 4, 2022. *Id.*; *id.* ¶ 11. This liability was never disclosed during the acquisition, but the letter noted that several earlier notices had been ignored, suggesting William had been aware of the tax issues prior to DFCO's acquisition of the company but had failed to inform DFCO. *Id.* ¶ 53. The second notice stated that a previously submitted Research and Development tax credit claim for the same accounting period had been rejected. *Id.* ¶ 54.

On or about October 29, 2024, DFCO was notified by its project team in Switzerland that William had contacted a client and made disparaging statements about the company, casting doubt on the project's viability. *Id.* ¶ 56. Concerned, the client reached out to a DFCO representative to discuss what they had heard. *Id.*

It also became known to DFCO in October of 2024 that William had "personally interfered with the sale of 75 heat pump units basically ordering other employees to stop selling the units. [William] stated to employees that he did not 'consider that the business was viable going forward,'" *id.* ¶ 58, and that he had begun "contacting Plaintiff's customers with the intent to interfere with customer relations," *id.* ¶ 59.[1]

"On or about November 1, 2024 Plaintiff inadvertently received an email regarding a meeting with William, Jillian and potential[ly] Ian discussing Plaintiff's EVOS units." *Id.* ¶ 57. None of these individuals have any right or authority to sell, transfer, or otherwise encumber Plaintiff's property, including the EVOS units. *Id.*

"Since William initiated the second investigation and filed various complaints, Plaintiffs['] stock price has plummeted, at one point dropping from $0.17 to $0.01. which is an estimated share price loss to Plaintiffs in the amount of approximately $7,200,000.00." *Id.* ¶ 55. Furthermore, once William left the company in September of 2024, "Defendant Marion [Bonar] [ ] created a hostile work environment at [DFCO's] facility in Scotland. Marion was upset that she was not included in an interview of a potential employee and commented that it didn't matter because 'the business isn't even going to be here in six weeks.'" *Id.* ¶ 60. And Defendant Samantha Mackenzie "joined William, Ian and Marion in litigation in the United Kingdom challenging the terms of the Purchase Agreement for Silicon Services Consortium, some two years after the agreement was executed and implemented." *Id.* ¶ 61.

Further investigation in September of 2024, during a site visit by Plaintiff's U.S. representatives, revealed that several items had gone missing from the Scotland facility. *Id.* ¶ 63. These missing items included "employment manuals, proprietary drawings, [and] technical manuals regarding the installation, maintenance and repair of the heat pump

---

[1] The Court presumes that the Complaint's reference to "Dylan" is a typographical error and construes the allegations as directed against Defendant William Bonar, given the surrounding context and the absence of any other mention of a "Dylan" in the Complaint.

units." *Id.* This occurred just prior to William's final departure. *Id.* Additionally, Defendants have refused to return "all of the corporate books associated with Dalrada Technology Ltd., Deposition Technology Ltd., Silicon Services Consortium and Likido Ltd[.]," despite repeated requests. *Id.* ¶ 64.

## III.    DISCUSSION

### A. Motion to Strike Arguments in Defendants' Replies (ECF No. 24)

In their Replies to the Motions to Dismiss for Lack of Personal Jurisdiction and the Anti-SLAPP Motion to Strike (ECF Nos. 18–22), Defendants contend that "Plaintiff's Attorney, Andrew L. Jones, does not satisfy this Court's pro-hac vice requirements." (ECF Nos. 18 at 7, 19–22 at 5.) Specifically, Defendants contend that "[p]ublic record information indicates Mr. Jones regularly engages in business, professional and other activities in California," which is expressly prohibited under Local Rule 83.3.c.4. *Id.* In support, Defendants attach exhibits containing such public records to their Replies, which include Mr. Jones' personal identifying information, such as his address. (*See* ECF Nos. 18 at 11–75, 19–22 at 8–69, 18-1, 19-1, 20-1, 21-1 & 22-1.)

Plaintiffs move to strike these contentions from Defendants' Replies on the grounds that they improperly raise new arguments in reply and improperly disclose personal identifying information. (ECF No. 24.) Plaintiffs also request the Court enter sanctions against Defendants. *Id.* at 4–5.

The Court reminds Plaintiffs' counsel that Local Rule 83.3.c.4 states that:

[a]n attorney not eligible for admission under Civil Local Rule 83.3.c hereof, but who is a member in good standing of, and eligible to practice before, the bar of any United States Court or of the highest court of any state or of any territory or insular possession of the United States, who is of good moral character, and who has been retained to appear in this court, and who agrees to adhere to this court's rules, including without limitation, the Court's Code of Conduct under Civ. L.R. 2.1 and Crim. L.R. 2.1, may, ***upon written application and in the discretion of the Court***, be permitted to appear and participate in a particular case. Unless authorized by the Constitution of the United States or acts of Congress, ***an attorney is not eligible to practice***

24-cv-2166-WQH-BLM

*pursuant to this local rule if any one or more of the following apply to the attorney: (1) resides in California, (2) is regularly employed in California, or (3) is regularly engaged in business, professional, or other activities in California.*

*The pro hac vice application must be presented to the Clerk, along with an admission fee in the amount set by the judges of this court by general order.* The fees must be deposited in the nonappropriated funds of the Court and divided between the library fund and the pro-bono fund in the manner designated by such general order. *The application must state under penalty of perjury (1) the attorney's city and state of residence and office address;* (2) by what court(s) the attorney has been admitted to practice and the date(s) of admission; (3) that the attorney is in good standing and eligible to practice in said court; (4) that the attorney is not currently suspended or disbarred in any other court; (5) if the attorney has concurrently or within one year preceding the current application made any pro hac vice application to this court, the title and the number of each matter wherein the application was made, and the date of application, and whether or not the application was granted; and (6) that the attorney has read, understands and agrees to adhere to each of this Court's Rules, including, without limitation, the Court's Code of Conduct under Civ. L.R.2.1 and Crim. L.R. 2.1. The attorney must also designate in the application a member of the bar of this court with whom the Court and opposing counsel may readily communicate regarding the conduct of the case and upon whom papers will be served. The attorney must file with such application the address, telephone number and written consent of such designee.

S.D. Cal. CivLR 83.3.c.4.

The docket reflects that Plaintiffs' counsel, Andrew Jones—who signed Plaintiffs' Responses in Opposition to the Motions to Dismiss and the Anti-SLAPP Motion (ECF Nos. 12, 14–17)—did so while seemingly intending to appear pro hac vice without having submitted a pro hac vice application, in violation of Local Rule 83.3.c.4. Specifically, the filings signed by Jones state that Jones is a member of the Texas bar. The Court accepts these filings (ECF Nos. 12, 14–17), for the limited purpose of resolving the pending motions (ECF Nos. 6–10) but cautions Plaintiffs' counsel that any future noncompliant filings will be stricken from the record. To appear before this Court, Jones must either

24-cv-2166-WQH-BLM

submit a proper pro hac vice application for the Court's approval or otherwise establish eligibility to appear under Local Rule 83.3.

Plaintiffs' Motion to Strike Arguments in Defendants' Replies requests the Court strike Defendants' "new arguments" and order Defendants to "refile redacted Reply Briefs." (ECF No. 24 at 5.) The Court finds that Defendants' Reply Briefs contain Andrew Jones' personal identifying information. Accordingly, the Clerk of the Court is directed to strike Defendants' Replies (ECF Nos. 18–22) in their entirety. Defendants shall re-file their Replies excluding all exhibits that contain Jones' personal identifying information. (*See* ECF Nos. 18 at 15–75, 19–22 at 8–69, 18-1 at 5–65, 19-1, 20-1, 21-1 & 22-1.) Defendants may retain the section titled "Plaintiff's Attorney, Andrew L. Jones, Does Not Satisfy This Court's Pro Hac Vice Requirements" but must exclude any references to exhibits that contain Jones' personal identifying information.

Plaintiffs' request for sanctions is denied at this time. Plaintiffs have not demonstrated that Defendants acted in bad faith or that this case meets the "rare and exceptional" standard warranting sanctions. *See Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (fee sanctions apply when a party acts in bad faith, vexatiously, wantonly, or for improper purposes) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)); *see also United States v. Rico*, 619 F. App'x 595, 601 (9th Cir. 2015) ("[S]anctions should be reserved for the 'rare and exceptional case.'").

Plaintiffs' Motion to Strike Arguments in Defendants' Replies (ECF No. 24) is granted in part and denied in part as described above. The Clerk of the Court shall strike Defendants' Replies (ECF Nos. 18–22) in their entirety. Defendants must refile their Replies within ten days of the issuance of this Order, excluding exhibits that contain Andrew Jones' personal identifying information (*see* ECF Nos. 18 at 15–75, 19–22 at 8–69, 18-1 at 5–65, 19-1, 20-1, 21-1 & 22-1).

/ / /

/ / /

**B. The Motions to Dismiss for Lack of Personal Jurisdiction Under Rule 12(b)(2) (ECF Nos. 6–9)**

On a motion to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction. *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 912 (9th Cir. 1990). Where the motion to dismiss is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts" to satisfy this burden. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002) (citation and internal quotation omitted). While the plaintiff cannot "simply rest on the bare allegations of its complaint," *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977), uncontroverted allegations in the complaint must be taken as true. *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id.*; *see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal."). "[I]f a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

The exercise of personal jurisdiction over a nonresident defendant must be authorized under the state's long-arm statute and must satisfy the due process clause of the United States Constitution. *Pac. Atl. Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985). California's long-arm statute permits the exercise of personal jurisdiction "on any basis not inconsistent with the Constitution of this state or the United States." Cal. Civ. Proc. Code § 410.10. Under due process analysis, a defendant may be subject to either general or specific personal jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

13

24-cv-2166-WQH-BLM

### *1. General Jurisdiction*

To exercise general jurisdiction over a non-resident defendant, the defendant must have "continuous and systematic" contacts that "approximate physical presence in the forum state." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (citations and internal quotations omitted).

The Complaint alleges no facts indicating that any of the Specially Appearing Defendants had "continuous and systematic" contacts in California. Instead, the Complaint alleges only that the Specially Appearing Defendants are either residents of Scotland or the UK. Accordingly, the Court concludes Plaintiffs have failed to make a prima facie showing that this Court has general personal jurisdiction over the Specially Appearing Defendants.

### *2. Specific Jurisdiction*

The Ninth Circuit analyzes specific jurisdiction according to a three-prong test:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007). With respect to the first prong, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980). "Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297. "The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach.,*

14

*Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion).

"[T]he purposeful direction or availment requirement for specific jurisdiction is analyzed in intentional tort cases under the 'effects' test derived from *Calder v. Jones*, 465 U.S. 783 … (1984)." *Dole*, 303 F.3d at 1111. "[T]he 'effects' test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* Whether an act is "expressly aimed" at the forum state requires "something more" than "foreseeable effects in the forum state." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006). It is not sufficient that the non-resident defendant "directed his conduct at plaintiffs whom he knew had [forum state] connections." *Walden v. Fiore*, 571 U.S. 277, 289 (2014).

The Specially Appearing Defendants contend that they are residents of either the UK or Scotland and that Plaintiffs have failed to adequately allege that they purposefully availed themselves of the forum of this Court or any court in the United States. (*See* ECF Nos. 6–9 at 7.) The Specially Appearing Defendants contend that Plaintiffs' Complaint states that any trade secrets allegedly divulged "were located in Scotland, not in the U.S." *Id.* The Specially Appearing Defendants contend that their burden in defending this lawsuit in the United States is significant because they have always been residents of the UK or Scotland and because most of the discovery in this case will be centered in Scotland. *Id.*

Plaintiffs contend that the Specially Appearing Defendants "committed tortious acts directed at Plaintiffs in California, namely tortious interference with contractual relations, tortious interference with business relations, business disparagement, defamation and misappropriation of trade secrets." (ECF Nos. 14–17 at 3.) Particularly, Plaintiffs contend that Plaintiff DFCO is "registered to do business in the state of California" and "is the parent company of Plaintiff [Deposition Tech.], a United Kingdom company, as well as other companies set forth in the original Complaint, i.e. Likido, Ltd., Dalrada Technology, Ltd. and Silicon Services Consortium." *Id.* Plaintiffs contend that the Specially Appearing

24-cv-2166-WQH-BLM

Defendants held positions in Deposition Tech., Dalrada Technology, Ltd., and Likido, Ltd. and conspired "to do harm in both reputation and revenue" to DFCO by directing their actions at the parent company. *Id.* Plaintiffs contend that "[t]he UK subsidiaries were and are not independent entities able to conduct business without the approval, oversight or financial backing of DFCO." *Id.* at 4.

The vast majority of Plaintiffs' allegations in the Complaint are specific to William Bonar, who is not moving to dismiss the Complaint pursuant to Rule 12(b)(2). The remaining allegations against the Specially Appearing Defendants stem entirely from (1) the creation of a "hostile work environment at Plaintiff's facility in Scotland" by Specially Appearing Defendant Marion Bonar; (2) Plaintiffs' inadvertent receipt of an email "regarding a meeting with [Defendants] William [Bonar], Jillian [Hughes], and potential[ly] Ian [Mackenzie] discussing Plaintiff's EVOS units"; and (3) litigation in the United Kingdom brought by Samantha Mackenzie, Ian Mackenzie, Marion Bonar, and William Bonar, "challenging the terms of the Purchase Agreement for Silicon Services Consortium." (*See* Compl. ¶¶ 57, 60–61.) As in *Walden v. Fiore*, "[i]t is undisputed that no part of [the Specially Appearing Defendants'] course of conduct occurred in [California]." 571 U.S. at 288. There are no allegations that the Specially Appearing Defendants "traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [California]." *Id.* at 289. Plaintiffs' contentions "improperly attribute[ ] a plaintiff's forum connections to the defendant[s] and make[ ] those connections 'decisive' in the jurisdictional analysis." *Id.*

Plaintiffs' contention that the Specially Appearing Defendants conspired to harm DFCO by directing their actions towards it does not create personal jurisdiction over them because "mere injury to a forum resident is not a sufficient connection to the forum … an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum state." *Id.* at 290; *see also Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (emphasizing the importance of alleging facts that connect a defendant's

16

conduct to the forum state and not merely to the plaintiff); *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980 (9th Cir. 2021) (noting that the defendant's only connection to the forum cannot be the plaintiff). The mere fact that DFCO, as the parent company of subsidiaries operating in the UK and Scotland, ultimately sustained the injuries inflicted on those subsidiaries does not create a meaningful connection between the Specially Appearing Defendants and California. *Id.*

Accordingly, the Court finds that Plaintiffs have failed to satisfy their burden of establishing any basis for personal jurisdiction over the Specially Appearing Defendants and grants the Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) (ECF Nos. 6–9). Defendants Marion Bonar, Samantha Mackenzie, Ian Mackenzie, and Jillian Hughes are dismissed without prejudice from this action.

### 3. *Plaintiffs' Request for Jurisdictional Discovery*

In their Responses in Opposition to Defendants' Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), Plaintiffs state that "[i]f the Court finds Plaintiff's [sic] allegations insufficient, Plaintiff[s] respectfully request[ ] jurisdictional discovery to further establish Defendant[s'] California contacts." (*See* ECF Nos. 14–17 at 7.)

"A court may permit discovery to aid in determining whether it has in personam jurisdiction." *Data Disc, Inc.*, 557 F.2d at 1285 n.1. "In granting discovery, the trial court is vested with broad discretion …." *Id.* "[W]here pertinent facts bearing on the question of jurisdiction are in dispute, discovery should be allowed." *Am. W. Airlines, Inc. v. GPA Grp., Ltd.*, 877 F.2d 793, 801 (9th Cir. 1989). "In order to obtain discovery on jurisdictional facts, the plaintiff must at least make a colorable showing that the Court can exercise personal jurisdiction over the defendant." *Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007). "This colorable showing should be understood as something less than a prima facie showing, and could be equated as requiring the plaintiff to come forward with some evidence tending to establish personal jurisdiction over the defendant." *Id*. However,

24-cv-2166-WQH-BLM

"[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Pebble Beach Co.*, 453 F.3d at 1160. A court need not grant discovery based on "purely speculative allegations of attenuated jurisdictional contacts …." *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011).

In this case, the Court finds that the discovery Plaintiffs seek would not change the jurisdictional analysis. Plaintiffs' "claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by" the Specially Appearing Defendants. *Pebble Beach*, 453 F.3d at 1160. Plaintiffs fail to make a "colorable showing" of personal jurisdiction in this case. *Mitan*, 497 F. Supp. 2d at 1119. The Court therefore declines to exercise its discretion to permit jurisdictional discovery.

### C. Anti-SLAPP Motion to Strike (ECF No. 10)

Under California Code of Civil Procedure § 425.16(b)(1) ("anti-SLAPP"), "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1); *see also Thomas v. Fry's Elecs., Inc.*, 400 F.3d 1206, 1206 (9th Cir. 2005) (explaining that the California anti-SLAPP statute may be enforced in federal court).

The California Supreme Court has established a two-step burden-shifting framework to evaluate anti-SLAPP motions. *Baral v. Schnitt*, 205 Cal. Rptr. 3d 475, 490 (Cal. 2016). First, "the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." *Id.* The defendant must demonstrate that "relief is sought based on allegations arising from activity protected by the statute." *Id.* If that standard is met, the second step applies and "the burden shifts to the plaintiff to

18

demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." *Id.*

The California Court of Appeal has clarified that when a defendant seeks to strike the entire complaint but fails to "identify in their motion individual claims or allegations that should be stricken even if the entire complaint were not," the defendant has failed to satisfy their burden under the first prong if the trial court "conclude[s]—correctly—that the complaint presented at least one claim that did not arise from anti-SLAPP protected conduct." *Park v. Nazari*, 93 Cal. App. 5th 1099, 1106 (Ct. App. 2023). Although a court "may grant a motion to strike individual allegations of protected activity within a complaint or cause of action," a court is not required to do so if the "movant has taken the position that the entire complaint arises from protected activity and requests that the entire complaint be stricken." *Id.* Specifically, the Court in *Park* held that

> while courts may strike less than the entirety of a complaint or pleaded cause of action, the trial court is not required to take on the burden of identifying the allegations susceptible to a special motion to strike. If a defendant wants the trial court to take a surgical approach, whether in the alternative or not, the defendant must propose where to make the incisions. This is done by identifying, in the initial motion, each numbered paragraph or sentence in the complaint that comprises a challenged claim and explaining "the claim's elements, the actions alleged to establish those elements, and wh[y] those actions are protected."

*Id.* at 1109 (alteration in original) (quoting *Bonni v. St. Joseph Health Sys.*, 11 Cal. 5th 995, 1015 (2021)).

The Anti-SLAPP Motion to Strike asserts that, "the Complaint for Damages filed by the Plaintiffs is itself prima facie pleadings based and emanating from the filing by Defendant William Ian Martin Bonar … of a complaint for fraud with the" SEC. (ECF No. 10 at 7.) The Motion goes on to assert that "[a]ll of the statement of facts are statements tied to the SEC complaint. And each of the causes of actions pled, tie to and emanate from,

as they specifically incorporate these allegations, to the whistleblower action." *Id.* (internal citations omitted).

The Anti-SLAPP Defendants request that the Court strike the Complaint in its entirety, but they do not identify "each numbered paragraph or sentence in the complaint that comprises [the] challenged claim[s] [nor do they] explain[ ] 'the claim's elements, the actions alleged to establish those elements, and wh[y] those actions are protected.'" *Park*, 93 Cal. App. 5th at 1109 (alteration in original) (quoting *Bonni*, 11 Cal. 5th at 1015).

Plaintiffs contend that "the conduct of Mr. Bonar by intentionally interfering with Plaintiffs['] business activities and continued harassment are not protected activities under the First Amendment of the U.S. Constitution and therefore," Defendants' assertion that the Complaint is entirely predicated on Defendant William Bonar's SEC complaint must fail. (ECF No. 12 at 3.) Plaintiffs additionally contend that,

> [t]he Defendants' conduct giving rise to this case, such as contacting customers of Plaintiffs in Switzerland on or about October 29, 2024, almost a year after Mr. Bonar filed the SEC complaint as well as other customers in an effort to interfere with contractual relations and business revenue, nor continued disparagement, or creating a hostile work environment, taking proprietary information from the company, breaching their fiduciary duties to the company, etc. have absolutely nothing to do with petition for the right to free speech protections of Cal. Code of Civ. Proc. §425.16.

*Id.* at 4.

Although many of Plaintiffs' factual allegations concern Defendant William Bonar's SEC complaint, the Court finds that at least some allegations are independent of any such protected activity. These include allegations that Defendants "disclosed [Plaintiffs'] trade secrets to other parties for the purpose of misappropriation" (Compl. ¶ 119); "engaged in conversations with potential customers without the knowledge or permission of Plaintiff in an effort to personally benefit from Plaintiff's trade secrets," *id.*; that "[William] had personally interfered with the sale of 75 heat pump units basically ordering other employees to stop selling the units," *id.* ¶ 58; and that William "contact[ed] Plaintiff's

customers with the intent to interfere with customer relations," *id.* ¶ 59. These factual allegations seemingly support causes of action—including breach of fiduciary duty, defamation, tortious interference with contractual relations, and misappropriation of trade secrets—that either do not involve protected activity or are "so-called 'mixed causes of action' that combine[ ] allegations of activity protected by the statute with allegations of unprotected activity." *Baral*, 205 Cal. Rptr. 3d at 478.

Because the Anti-SLAPP Defendants have not satisfied their initial burden under the first prong of the *Baral* framework—i.e., they have not demonstrated that the entire Complaint arises from protected conduct under § 425.16 nor have they otherwise identified the specific claims and causes of action which they challenge—the Court cannot proceed to the second prong. Furthermore, even if the Court could exercise its discretion to "take on the burden of identifying the allegations susceptible to a special motion to strike," *Park*, 93 Cal. App. 5th at 1109, it would decline to exercise such discretion in this case, based upon the vague allegations of the Complaint and Defendants' failure to move to dismiss any causes of action as inadequately pled pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6). Accordingly, the Anti-SLAPP Motion to Strike the Complaint and Defendants' request for attorneys' fees pursuant to California's Anti-SLAPP statute are denied.

## IV.  CONCLUSION

IT IS HEREBY ORDERED that the Motions to Dismiss pursuant to Rule 12(b)(2) (ECF Nos. 6–9) are granted. Defendants Marion Bonar, Samantha Mackenzie, Ian Mackenzie, and Jillian Hughes are dismissed for lack of personal jurisdiction.

IT IS FURTHER ORDERED that the Anti-SLAPP Motion to Strike (ECF No. 10) is denied in its entirety. Defendant William Bonar shall file an answer to the Complaint pursuant to Federal Rule of Civil Procedure 12(a).

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike Arguments in Defendants' Replies (ECF No. 24) is granted in part and denied in part as described above.

24-cv-2166-WQH-BLM

The Clerk of the Court shall strike Defendants' Replies (ECF Nos. 18–22) in their entirety. Defendants must refile their Replies within ten days of the issuance of this order, excluding all exhibits that contain Andrew Jones' personal identifying information. (*See* ECF Nos. 18 at 15–75, 19–22 at 8–69, 18-1 at 5–65, 19-1, 20-1, 21-1 & 22-1.)


Dated:  July 15, 2025

Hon. William Q. Hayes
United States District Court

24-cv-2166-WQH-BLM